**UNITED STATES of America,
Appellee,**

**v.**

**Solomon Leroy BROWN, Defendant-
Appellant.**

**No. 73–1168.**

United States Court of Appeals,
First Circuit.

Heard March 6, 1974.

Decided April 26, 1974.

Jonathan Shapiro, Boston, Mass., by appointment of the Court, with whom Burnham, Stern & Shapiro, Boston, Mass., was on brief for defendant-appellant.

Alan R. Hoffman, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., was on brief for appellee.

Before COFFIN, Chief Judge, ALD-RICH and McENTEE, Circuit Judges.

McENTEE, Circuit Judge.

Defendant was convicted under 18 U.S.C. § 371 (1970) of conspiring to utter forged United States Treasurer's checks in violation of 18 U.S.C. § 495 (1970). On this appeal, he raises numerous grounds for reversal, and urges particularly that his motion for judgment of acquittal should have been granted. Since this motion tests the sufficiency of the evidence, we must state the facts adduced at trial in some detail.

In early September 1971 certain United States Treasurer's checks prepared by the Navy Regional Finance Center in Washington, D. C. were stolen, and, in a manner unknown, made their way into the hands of one Vardell McPhatter. McPhatter, in an effort to fraudulently dispose of these checks, contacted a Boston friend named James Graham, who in turn put him in touch with one Earl Sabino, the then manager of the Grove Hall branch of the United States Trust Company in Dorchester. On the evening of September 14, McPhatter, Graham, Sabino and a fourth person, Joseph Gaddy, met at Graham's apartment in Dorchester. At this meeting, a scheme was devised where Graham and McPhatter, after forging endorsements on the stolen checks, would open various accounts under fictitious names at Sabino's bank and deposit the checks therein. This plan was put into operation the next day, when the checks, along with certain completed forms for opening the accounts, were given to Sabino by McPhatter at the bank. However, after placing the checks through a National Check Protective Service (NCPS) inquiry, Sabino found that they

would not clear. Consequently, it became too risky to actually attempt to deposit the checks at the bank. When Sabino informed McPhatter of the situation, he requested that the latter come down to the bank and pick up the checks. Some days later, this was done.

On September 22, McPhatter returned to the bank and asked Sabino to cash one of the forged checks. After some hesitancy because of the presence of bank auditors, Sabino complied with this request. Two days later, McPhatter again requested Sabino to cash another of the forged checks, and again Sabino complied.

Although McPhatter was able, with Sabino's assistance, to dispose of these two stolen checks, the failure of the checks to clear the NCPS inquiry compelled the abandonment of the original plan, and resulted in the development of a new scheme to sell all the remaining forged checks in a package deal. To that end, McPhatter contacted the defendant and his associate, Nathaniel Craigmiles. On October 3, McPhatter and Graham met with the defendant and Craigmiles to discuss the disposition of the checks. At this meeting, the defendant asserted that he thought he would be able to "get rid" of the checks, but no definite plan was actually arrived at. According to Craigmiles, defendant suggested the possibility of obtaining forged identifications for the checks and McPhatter indicated that he could bring somebody up from Washington with such identifications. As this meeting ended, McPhatter gave the defendant a sample of one or two of the checks.

The following day, Craigmiles and the defendant, who still held the sample checks, went to a certain store on Washington Street in Boston owned by a person known only as Billy. Defendant entered the store alone, and returned some twenty minutes later, informing Craig-

miles that Billy, who allegedly would dispose of the checks, wanted to see all the merchandise. Defendant and Craigmiles then departed and eventually returned to see McPhatter and Graham. Upon their arrival, they learned from one Evelyn Robinson that a man from Washington would arrive later in the week with the fake identifications.

On the evening of October 6, Dwight Woodley, a payroll clerk at the Navy Regional Finance Center in Washington, arrived at Logan International Airport with a package of United States government drivers' licenses, which were to serve as identification for the forged checks. Although the testimony at this point becomes somewhat confused, it appears that later that same evening, Woodley, Graham and McPhatter met with the defendant, Craigmiles and an individual named Paul at Graham's apartment. The purpose of this meeting was to arrange for the disposition of the checks, and at this time defendant informed the group that the potential buyer of the checks would "give them no money without seeing the goods."[1] Ultimately, however, various disagreements arose between McPhatter and the defendant, each asserting that the other was attempting to cheat him. As a result, defendant refused to deal further with McPhatter.

The next day, Woodley, who was staying with McPhatter at Graham's apartment, spoke to the defendant by telephone and it was agreed that the defendant would deal directly with Woodley, and no longer with McPhatter. Woodley then took the stolen checks and the identifications and left McPhatter and Graham in order to meet the defendant, Craigmiles and Paul. Upon meeting, the four men drove to Billy's store on Washington Street at which time defendant asked Woodley for the checks and identifications. Woodley,

---

1. There is some conflict in the testimony as to whether the defendant may have alternatively desired to purchase the checks himself, and, if so, whether, in order to accomplish this, he attempted to use phony money. However, upon reviewing the record as a whole, it appears that such efforts were essentially incidental and subordinate to the general scheme involving the use of Billy as a possible purchaser.

with some reluctance, turned them over. Defendant then went into the store, came out with two men, crossed the street into another building, and, twenty minutes later, returned to the car. At this point, defendant asked Woodley whether he could get some alien cards, presumably to be used for identification purposes. Woodley indicated that he could not. Defendant then went back into Billy's store, and returned some minutes later, informing Woodley that "the guy told us [to] come back around noon and we'll get our money." Woodley was then driven back to Graham's apartment and was told that he would be picked up again around noontime. However, unfortunately for Woodley, Graham and McPhatter, noontime came and went, without any word from the defendant. Eventually, they decided to nvestigate the situation, and, upon returning to Billy's store learned that they had been duped, and that the defendant had stolen the forged checks.

Meanwhile, after making off with the checks, defendant, Craigmiles and Paul drove into Boston. There, defendant deposited one check in a fictitious bank account at the State Street Bank, and Craigmiles attempted to cash another at the City Bank and Trust Company. Afterwards, the defendant and Craigmiles flew to Philadelphia, where they attempted, unsuccessfully, to dispose of the checks. Upon returning to Boston some nine days later, defendant, having failed to find a buyer, destroyed the stolen checks. Shortly thereafter all the principals involved in this somewhat bizarre operation were apprehended.

Defendant was subsequently charged in a one count indictment of conspiring with Woodley, McPhatter, Sabino and Graham to utter forged United States Treasurer's checks. Craigmiles was neither indicted, nor named as an unindicted co-conspirator. At trial, after the close of the evidence, the court instructed the jury in strict accordance with the conspiracy alleged in the indictment.

On this appeal, defendant makes a two-pronged assault on the sufficiency of the government's proof. First, he asserts that the evidence in the record fails to show that he ever actually entered into a conspiracy with the above named individuals. Second, he contends that even if the evidence were sufficient to establish his participation in some conspiracy, nonetheless such conspiracy was not a conspiracy to utter forged checks.

■ Defendant's initial contention can be easily disposed of. Essentially, he maintains that the evidence, taken as it must be, in the light most favorable to the government, United States v. Doran, 483 F.2d 369, 372 (1st Cir. 1973), conclusively refutes his participation in any conspiracy, and establishes either (1) that defendant's relationship with the McPhatter-Woodley group was simply that of prospective buyer and seller, note 1 *supra, see* United States v. Braico, 422 F.2d 543, 544 (7th Cir.), cert. denied, 398 U.S. 912, 90 S.Ct. 1712, 26 L.Ed.2d 74 (1970); United States v. Ford, 324 F.2d 950, 952 (7th Cir. 1963), or (2) that virtually from the beginning, defendant intended to defraud the McPhatter-Woodley group, and thus never fully possessed the requisite agreement or "stake in the outcome" essential to a conspiracy, United States v. Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

■ While the existence of a mere buyer-seller relationship might, in an appropriate case, United States v. Braico, *supra;* United States v. Ford, *supra,* preclude a finding of conspiracy, the evidence in the instant case clearly establishes substantially more participation upon defendant's part. Indeed, the evidence strongly compels the conclusion that defendant was at no point intended to be the actual buyer of the checks, but instead agreed to work with McPhatter, Graham, and later Woodley, to locate and arrange for such a buyer. As the jury could reasonably believe, defendant's request for identifications was not

intended for his immediate use, but rather was intended to sweeten any deal that could be made by defendant with a potential purchaser.[2] Moreover, defendant's conduct at and after his initial October 4 encounter with Billy, his comment at the October 6 meeting at Graham's apartment that the proposed buyer wanted to see all the merchandise, and his October 7 statement to Woodley that "the guy told us [to] come back around noon and *we'll* get our money," is particularly supportive of defendant's role as a co-conspirator, and not a mere prospective purchaser.

■■ Defendant's claim that the evidence effectively demonstrated that he intended to defraud his putative partners virtually from the moment he arrived on the scene, and thus that he entered into no real agreement with them, must similarly fail. While it is obviously true that at some point in the relationship, defendant decided to bilk the McPhatter-Woodley group, it does not definitely appear at what point such a decision was made. The jury could have believed that after Woodley informed defendant that no alien cards would be produced, the deal with Billy thereupon fell through. It was arguably at this point that defendant, in order to salvage something for himself, determined to swindle the others. Or, it may be that the defendant's plot was hatched after his apparently bitter falling out with McPhatter on October 6. At any rate, from this record, it is impossible to say with much assurance precisely when defendant decided to act on his own. Since an agreement at any time during the *continuance of a conspiracy is sufficient for criminal liability to attach,*

United States v. Robinson, 470 F.2d 121, 123 (7th Cir. 1972); United States v. Calise, 217 F.Supp. 705, 708 (S.D.N.Y. 1962), we cannot say that the jury, in considering the evidence of defendant's conduct earlier alluded to, had an insufficient basis upon which to conclude that there actually was an agreement reached between defendant and the McPhatter-Woodley group at some point *prior* to defendant's decision to defraud his partners.[3]

■ Defendant's second attack on the sufficiency of the evidence is somewhat more ingenious. He asserts that although the record may indicate his participation in some conspiracy, it does not establish that he participated *with his alleged co-conspirators* in a conspiracy to *utter* forged checks.[4] In support of this contention, defendant makes the following argument, in which he maintains that the facts reveal three separate and distinct conspiracies:

Conspiracy 1—Defendant contends that from September 14 through approximately September 24, the undisputed evidence clearly implicates McPhatter, Graham and Sabino in a conspiracy to utter forged checks by either depositing them in fictitious accounts at Sabino's bank, or by cashing the checks there. However, the evidence also suggests that upon failure to procure NCPS clearance for the checks, this conspiracy had to be abandoned, and, by the time defendant was contacted, had been essentially abandoned. Thus, defendant asserts, he cannot be held liable for conspiring to utter checks as a result of the acts committed at Sabino's bank, since by the time he actually entered into a conspiracy, *see infra,* this prior conspiracy had already

---

2. Such identification would, of course, be desirable, and perhaps necessary, from the ultimate purchaser's point of view, since the checks would have no value to anyone unless they eventually could be successfully uttered.

3. We thus need not consider the additional argument that although defendant may have, from the start, *subjectively* intended to swindle the McPhatter-Woodley group, his outward appearance of *objective* agreement would suffice to establish a conspiracy. *Cf.*

United States v. Schroeder, 433 F.2d 846, 849 n. 3 (8th Cir. 1970), cert. denied, 401 U.S. 943, 91 S.Ct. 951, 28 L.Ed.2d 224 (1971).

4. In order to commit the substantive offense of uttering a forged Treasurer's check, there must be some attempt to circulate the check by means of a fraudulent representation that it is genuine. *See, e. g.,* United States v. Jenkins, 347 F.2d 345 (4th Cir. 1965).

terminated. Accordingly, the traditional rule that one who joins a conspiracy already in progress is liable for acts done in furtherance of that conspiracy prior to his joinder, *see, e. g.,* United States v. McGann, 431 F.2d 1104, 1106 (5th Cir. 1970), cert. denied, 401 U.S. 919 (1971), 91 S.Ct. 904, 27 L.Ed.2d 821; United States v. Cimini, 427 F.2d 129, 130 (6th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970), is, defendant maintains, inapplicable to the instant facts, since there was no effective conspiracy "already in progress" by the time he entered the picture. *Cf.* United States v. Borelli, 336 F.2d 376, 384–386 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); United States v. Peoni, 100 F. 2d 401, 403 (2d Cir. 1938).

Conspiracy 2—Defendant next asserts that while it may be true that from October 3, when he first met with McPhatter and Graham, through October 7, when he bilked Woodley out of the checks he may have been conspiring with the McPhatter-Woodley group, such conspiracy was nonetheless aimed not at uttering forged checks, but rather at fencing them in a package deal. Relying on the statement in Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959) that "[c]onspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself," defendant asserts that if he agreed to do anything it was simply

> "to act as a broker for sale of the checks to an unknown third party who was certainly aware that they were both stolen and forged. . . . [T]his is not consistent with the intent to utter or publish the checks as true that is necessary to support [a] conviction of conspiring to violate 18 U.S.C. § 495."

Consequently, defendant contends that since the indictment charged conspiracy to utter checks, and not conspiracy to sell or transfer them, the evidence of his conduct during this period will not support his conviction.

Conspiracy 3—Finally, defendant maintains that once he swindled the checks from Woodley, his participation in any continuing conspiracy with the McPhatter-Woodley group was clearly and irrevocably terminated. *Cf.* United States v. Chester, 407 F.2d 53, 55 (3d Cir. 1968), cert. denied, 394 U.S. 1020, 89 S.Ct. 1642, 23 L.Ed.2d 45 (1969). While acknowledging that he may thereafter have entered into a conspiracy with Craigmiles to utter checks at the State Street Bank and at the City Bank and Trust Company in Boston, this particular conspiracy was not alleged in the indictment. Since defendant was charged with conspiring to utter checks with McPhatter, Woodley, Graham and Sabino, and the jury strictly instructed on that basis, and since Craigmiles was not in any manner named as a co-conspirator, defendant contends that any proof with respect to a conspiracy involving Craigmiles is at material variance with the indictment, *see, e. g.,* United States v. Goss, 329 F.2d 180 (4th Cir. 1964), and thus cannot sustain his conviction. *See* United States v. Spanos, 462 F.2d 1012, 1017 (9th Cir. 1972); Danielson v. United States, 321 F.2d 441, 444 & n. 8 (9th Cir. 1963).

 Though defendant has presented us with a plausible argument, his suggested analysis does not bear close scrutiny. Even if we were to accept for present purposes defendant's "three conspiracies" theory, and further accept *arguendo* the contention that defendant is consequently not responsible under the indictment for the acts committed at Sabino's bank[5] (Conspiracy

---

5. The question of whether the facts indicate one or more distinct conspiracies is normally a matter of fact to be determined by the jury. *See, e. g.,* Koolish v. United States, 340 F.2d 513, 526 (8th Cir.), cert. denied, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965); United States v. Boyance, 215 F. Supp. 390, 395 (E.D.Pa.1963), aff'd, 329 F. 2d 372 (3d Cir.), cert. denied, 377 U.S. 965, 84 S.Ct. 1645, 12 L.Ed.2d 736 (1964). In

1), or the acts committed with Craigmiles [6] (Conspiracy 3), his claim must in any case be rejected.

■ In stating that the evidence with respect to the October 3 through October 7 transactions establish only a conspiracy to transfer forged checks, and not a conspiracy to utter them, defend- ant takes too narrow a view of the nec- essary requirement of intent. Whether or not defendant, or for that matter the McPhatter-Woodley group, intended themselves to utter the checks directly, it is abundantly clear that the essential thrust of their scheme was to have the checks publicly uttered, either by Billy or by some other prospective purchaser. *See* United States v. Tramaglino, 197 F. 2d 928, 930–931 (2d Cir.), cert. denied, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1956). Indeed, no substantial purpose would have been served by much of de- fendant's pre-October 7 machinations had there not been the expectation, un- derstanding and design on the part of all the conspirators that the checks would be subsequently uttered. Thus, it is evident that the entire purpose behind acquiring the phony driver's licenses, and behind defendant's request for the alien cards, was to obtain sufficient identification so that the stolen checks could and would be successfully uttered. *See* note 2 *supra.* Therefore defendant may not be permitted to escape liability by alleging that he merely conspired to transfer checks, and not to utter them, when it was apparent to him that the ultimate and necessary consequences of the scheme was to utter the checks, and when the defendant, by attempting to procure appropriate identification, made a substantial effort to further that end. *See, e. g.,* United States v. Chamley, 376 F.2d 57, 59–60 (7th Cir.), cert. denied, 389 U.S. 898, 88 S.Ct. 221, 19 L.Ed.2d 220 (1967); *cf.* United States v. Rich, 262 F.2d 415, 418 (2d Cir. 1959). Under these circum- stances, the evidence respecting defend- ant's transactions with McPhatter, Woodley and Graham was, in our view, fully adequate to support his conviction for conspiring to utter checks in viola- tion of § 495.[7]

the instant case, it does not appear that de- fendant made any request to instruct the jury on the possibility of separate conspir- acies, and consequently no such instruction was given. *But see* United States v. Varelli, 407 F.2d 735, 747 (7th Cir. 1969). Upon completion of the trial court's charge, which was grounded upon the assumption of a sin- gle conspiracy, the defendant made no objec- tion. In our view, the jury would have been justified in finding, upon consideration of all the evidence, that, at least until October 7, there was simply one continuing conspiracy manifesting itself in different forms. *Cf.* United States v. American Honda Motor Co., 271 F.Supp. 979, 983 (N.D.Cal.1967). This being so, the defendant would clearly be re- sponsible for the uttering of checks at Sabi- no's bank, even though such acts occurred prior to his joining the conspiracy. Under this view of the facts, there would be more than sufficient evidence to sustain defend- ant's conviction under § 495.

6. While proof of a conspiracy with Craig- miles is at obvious variance with the indict- ment, such a variance would only be fatal if it actually prejudiced the defendant, or ad- versely affected his substantial rights. Rob- inson v. United States, 333 F.2d 950 (5th Cir.), cert. denied, 379 U.S. 921, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964); Hayes v. Unit- ed States, 329 F.2d 209 (8th Cir.), cert. de- nied, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964). Though we need not expressly decide the matter, it does appear likely that, in view of the possibility of surprise, and the potential adverse impact upon defend- ant's preparation for trial, a sufficient dem- onstration of prejudice would have been shown, so as to preclude conviction under the indictment for defendant's conduct with Craigmiles. *See, e. g.,* United States v. Spa- nos, *supra.*

7. That Sabino did not personally participate in these specific transactions is not suffi- cient to establish a material variance from the indictment. *See* Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Absent unusual circumstances, there is no prejudice to the defendant, *see* note 6 *supra,* where an indictment charges a conspiracy involving several persons, and the proof only establishes participation on the part of some of them. *Id.* at 81, 55 S.Ct. 629.

■ Defendant's remaining contentions are entirely without merit. Having carefully weighed defendant's speedy trial claim in light of the multiple factors enunciated in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L. Ed.2d 101 (1972) and United States v. Cabral, 475 F.2d 715 (1st Cir. 1973), we must conclude that such a claim cannot be sustained. While the seventeen month delay here involved is hardly insubstantial, part of that delay is attributable to various defense motions respecting discovery and change of counsel. And although much of the delay is apparently the result of prosecutorial neglect, this factor will weigh less heavily in defendant's favor than where the government's conduct is deliberate and purposeful. See Barker v. Wingo, supra, 407 U.S. at 531, 92 S.Ct. 2182. Moreover, despite the length of delay, defendant never made any real effort to assert his right to a speedy trial for nearly fifteen months. During much of that time, he was incarcerated at M.C.I. Walpole in Massachusetts (a state maximum security prison), but neither the fact of his incarceration nor its assertedly prejudicial location is strictly attributable to the pendency of the instant action. From March 1972 onwards, defendant was under a five-year sentence for an unrelated mail theft conviction so that his incarceration at some institution was in any case necessary. And his assignment to Walpole was, in part, to facilitate his trial on several pending state charges. However, the most important consideration working against defendant's speedy trial claim is the fact that he suffered no real prejudice by the delay. In view of the abundance of direct evidence produced against him at trial, defendant must do more to establish prejudice than baldly assert that "witnesses who obviously will testify in other areas can corroborate my innocence."

Cf. United States v. Morse, 491 F.2d 149, 157 (1st Cir. 1974).[8]

■ Defendant also contends that the trial court abused its discretion in denying his motion for a thirty day continuance so that he could retain new counsel. However, in view of the fact that defendant, already represented by adequate counsel, was now seeking his third attorney in this matter, and had previously been granted a two-week continuance expressly for this purpose, and in view of the fact that on the day he made the motion, trial was set to commence and the jurors and out-of-state witnesses had all been summoned, we cannot say that the court abused its broad discretion in denying this motion.

All other points raised by defendant have been considered and have been found to be without merit.

Affirmed.

---

8. Defendant's additional claim of prejudice—that he lost the possible opportunity of receiving a sentence concurrent with that of his mail theft conviction—is "highly speculative and falls far short of a demonstration of actual prejudice." United States v. Cabral, supra, 475 F.2d at 720.