**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John DeJOHN, Defendant-Appellant.**

**Nos. 79-2126, 80-1654.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1980.

Decided Jan. 5, 1981.

Carol R. Thigpen, Jenner & Block, Chicago, Ill., for defendant-appellant.

Patrick G. Deady, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and CUDAHY, Circuit Judges, and CAMPBELL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant John DeJohn appeals from a jury conviction on the charge of uttering and publishing two United States Treasury checks in violation of 18 U.S.C. § 495.[1] Defendant claims that the district court erred in admitting certain evidence, limiting defendant's cross-examination of a government witness, denying a motion for judgment of acquittal, and refusing certain jury instructions. In addition, defendant challenges the district court's sentence of a fine and imprisonment to be imposed if defendant was unable to find a job.

We affirm.

### I.

Defendant lived at a YMCA in Chicago at the time of the offenses. Andy Spyropoulos, who owned a restaurant near the YMCA, testified that he cashed two United States Treasury checks for defendant, one around December 23, 1977 and the other about a week later. Defendant had been a regular customer at the restaurant for two months, and with his friends spent about $35 to $45 each day until the time defendant presented the checks in question. The payee on the first check (in the amount of $317) was Horace Palm, and the payee on the second check (in the amount of $311) was Timothy Lutes. Both resided at the same YMCA as defendant. Each testified that he never received the check on which he was named as payee.[2] Neither man knew defendant personally, although one knew defendant by sight because they lived on the same floor at the YMCA.

The checks that Mr. Spyropoulos cashed for defendant bore forged endorsements of the respective payees. Defendant's name does not appear on either check. Mr. Spyropoulos did not ask defendant for identification or an endorsement when he cashed the checks. The government stipulated in effect that defendant did not forge the payees' signatures appearing on the checks.

### II.

Defendant asserts that the district judge should not have permitted the testimony of certain prosecution witnesses, characterizing their testimony as "bad acts" evidence prohibited by Federal Rules of Evidence 404(b) and 403. Defendant objects to testimony by a YMCA security guard who stated that he "arrested" the defendant when he found him behind a reception desk at the YMCA in violation of the establishment's rules. Defendant also objects to the testimony of a Chicago police officer that in the course of searching defendant at police headquarters on an occasion unrelated to the offense for which defendant was on trial, the officer found checks, one of them a Treasury check, made out to a payee named Michael Dore. The officer testified that defendant stated he had obtained the checks from a mailbox behind the reception desk at the YMCA and was holding them for safekeeping. Police were unable to locate the payee of the checks and no charges were filed against defendant as a result of the checks found in the search.

---

\* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. 18 U.S.C. § 495 provides in pertinent part: Whoever falsely makes, alters, forges, or counterfeits any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving, or of enabling any other person, either directly or indirectly, to obtain or receive from the United States or any officers or agents thereof, any sum of money; or Whoever utters or publishes as true any such false, forged, altered, or counterfeited writing, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited;

\* \* \* \* \* \*

shall be fined not more than $1,000 or imprisoned not more than ten years, or both.

2. Both Mr. Palm and Mr. Lutes received replacement checks when they informed the appropriate government agencies that they had not received the original checks.

■ As applied to the defendant in a criminal case, Rule 404 prevents any effort to prove that the defendant acted in the criminal manner as charged by the introduction of evidence showing the defendant acted in a similar way at some other time not charged. As part (b) of the rule indicates, though, evidence of similar actions generally *is* admissible when introduced for purposes other than those which (under the rule) improperly show propensity to commit the crime. Here, the testimony of the security officer and the policeman was highly probative of the defendant's opportunity to gain access to the mailboxes and obtain the checks that he cashed at a later time knowing the checks to contain forged endorsements.[3] This circumstantial evidence was properly admissible.[4]

3. Just prior to trial, during discussion regarding admission of the evidence, the judge stated "This is solely for the purpose of showing that the defendant had a certain way of getting hold of checks." (Tr. 8)

4. Defendant argues that in order for the similar acts evidence in this case to be admissible, the acts must be: 1) similar enough and close enough in time to the offense to be relevant; 2) shown by clear and convincing evidence to have occurred; 3) of not so prejudicial a nature as to outweigh their probative value; 4) relevant to an issue disputed by defendant. Defendant's citation of *United States v. Feinberg*, 535 F.2d 1004 (7th Cir.), *cert. denied*, 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300 (1976), and *United States v. Ostrowsky*, 501 F.2d 318 (7th Cir. 1974), for these contentions is inapposite in the present case.

Those cases deal with the admissibility of similar crimes evidence directed to the issues of intent and motive, and this particularly is pertinent for the last of the four points that defendant contends governs admissibility. *See United States v. Fierson*, 419 F.2d 1020 (7th Cir. 1969). Here the testimony was directed to defendant's *opportunity* to obtain the checks. It is important to avoid unnecessary use of similar acts evidence on the issues of intent and motive because the evidence may be unduly prejudicial on subjective issues of a defendant's conduct. "Opportunity" is not a subjective issue: either defendant had access to the checks or he did not. Defendant's theory of the case as a practical matter brought into prominence the issue of opportunity even though he did not "dispute" it in the common use of that term. In this context, actual dispute of the issue is not required. *Compare United States v. Weidman*, 572 F.2d 1199 (7th Cir.), *cert. denied*, 439

The issue of opportunity became material to the trial once defense counsel set forth the theory in opening argument that it was not their client who uttered the forged checks. Defendant's opportunity to gain access to the checks thus became a key issue.[5]

■ In connection with this testimony, defendant asserts that the district judge should have analyzed the evidence under Rule 403 to determine whether its probative value outweighed its prejudicial effect, and then stated in writing its reasons for admitting the evidence. *See United States v. Dolliole*, 597 F.2d 102 (7th Cir. 1979). The district judge did indicate that he had balanced the probative value and prejudicial effect when he said of the evidence, "The

U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), (defendant need not dispute element of specific intent in order to permit into evidence similar bad acts bearing on intent since prosecution must prove that element to make its case).

We note that defendant's acts of going behind the YMCA desk and removing checks from the mailboxes at other times are identical to the acts that bear on the opportunity issue in the present case, and were close in time to the offenses charged; that the testimony of the security guard and policeman provided, at the least, clear and convincing evidence that the acts occurred; and that the evidence was so highly probative as to outweigh any prejudicial effect its admission might have had.

5. In this regard, defendant's citation of *United States v. Foskey,* 636 F.2d 517 (D.C.Cir. 1980), is not on point. The prosecution in that case introduced evidence that the defendant Foskey had been arrested along with another man on charges of drug possession, but had been released when the other man told police that Foskey knew nothing about the drugs. There, the evidence, which went to the element of intent in a later drug prosecution against Foskey, if anything indicated a *lack* of intent on Foskey's part. The D.C. Circuit panel held the admission of the evidence on intent to be irrelevant and reversible error. By contrast, here the evidence was highly probative of defendant's ability to obtain checks from the mailboxes at the YMCA, the address to which the checks at issue in this case were mailed. The concern of the *Foskey* court that the evidence would as a practical matter be probative only of defendant's propensity for crime is not present in the case before us.

fact that it may be to some extent prejudice [sic] to the defendant doesn't make it inadmissible." We agree that it would have been preferable for the district judge to have set down his reasons in writing, but where, as here, the balance so clearly favors admission of the testimony we will not presume that the evidence was admitted for the wrong reasons. *United States v. Price,* 617 F.2d 455, 460 (7th Cir. 1979).

 As a collateral point, defendant argues that the government "unfairly and prejudicially" injected the issue of his character into its case by refusing to stipulate to the basic facts about which the YMCA security officer and the policeman testified. We disagree with this contention. The government is not bound to stipulate to such facts unless the prejudicial aspects of the testimony in context outweigh its probative value, although the feasibility of a stipulation and the prosecution's need for the testimony, *see United States v. Spletzer,* 535 F.2d 950 (5th Cir. 1976), generally should be taken into account by the trial judge in the weighing process. *United States v. Peltier,* 585 F.2d 314, 324–25 (8th Cir. 1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). Here, when defense counsel asked the district judge about the possibility of a stipulation they were told to take up the matter initially with the prosecution. So far as the record shows, the district court was never presented with additional argument on the necessity of a stipulation and so the court stood upon its initial determination that the testimony was admissible in its entirety. In view of our earlier conclusions on the nature and importance of the testimony in this case, we find that defendant was not unfairly prejudiced by the prosecution's refusal to stipulate to the facts as requested.

At the close of the government's case, the district judge denied defendant's motion for judgment of acquittal. Defendant argues that the government failed to produce competent evidence that he knew the payees' signatures on the checks were forged, especially in light of a stipulation that the signatures were so dissimilar from defendant's handwriting that the checks were not submitted to a handwriting analyst for comparison. Defendant also points to the fact that the forged endorsements appeared to convert the checks to bearer paper, thus raising a question whether defendant could have innocently presented the checks for payment having been given them by the party who perhaps had accomplished the forgery. The question in determining a motion for judgment of acquittal is whether "all reasonable men, on all the evidence presented, would of necessity find that the government did not prove beyond a reasonable doubt" that defendant knew the payees' signatures were forged. *United States v. Velasco,* 471 F.2d 112, 113 (7th Cir. 1972). We conclude that the district court properly denied defendant's motion.

At the close of its case the government had introduced evidence through Andy Spyropoulos that it was defendant who presented the Treasury checks later found to contain forged endorsements. Mr. Spyropoulos also testified that defendant made statements [6] consistent with the inference that the signatures in fact were genuine. The statements in connection with the second check suggested defendant was trying to hurry the restaurant owner into cashing the checks by playing on the owner's loyalties to a regular customer. The payees named on those checks testified that they never received or authorized their endorsements on the checks that defendant negotiated to Mr. Spyropoulos. And the checks were cashed within a few days of the dates of issuance that the checks bore. The evidence of the YMCA security guard and the policeman established that defendant had the opportunity to obtain the checks from the mailboxes at the address to which the checks were posted.

---

6. When cashing the first check, defendant told Mr. Spyropoulos that it belonged to one of defendant's friends. The restaurant owner balked when defendant tried to cash the second check purportedly for another friend. Defendant asked Mr. Spyropoulos to cash the check so that defendant would not be embarrassed.

■ The testimony taken together establishes a basis for the jury to determine beyond a reasonable doubt that defendant knew that the payees' endorsements on the checks were not genuine. Utilizing a forged check in ordinary commerce in itself may be sufficient to establish an attempt to circulate the check as genuine. *United States v. Duvall*, 537 F.2d 15 (2d Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). And defendant's knowledge that the endorsements were forged may be inferred from the totality of evidence in the case. *United States v. Calabro*, 467 F.2d 973 (2d Cir. 1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973). Regardless of whether defendant himself forged the signatures on the checks,[7] it is a more than fair inference that if defendant took advantage of an opportunity to seize the checks from the mailboxes before the payees received them, he knew that the payees did not sign them or authorize them to be signed and so he cashed the checks with fraudulent intent. Coupled with fair inferences that may be drawn from defendant's statements when he cashed the checks, the evidence was ample to justify sending the case to the jury.

■ Defendant's attempts to raise doubts as to Mr. Spyropoulos's veracity by questioning him on his failure to obtain defendant's endorsement on the checks were not sufficient to overcome as a matter of law the fair inferences on the issue of intent that could be drawn from the government's evidence. And the fact that the checks were in bearer form was not sufficient in itself to negative any inference of intent on defendant's part. Instead, the defense raised submissible issues on the strength of the government's evidence, *see United States v. Watts*, 532 F.2d 1215 (8th Cir. 1976), which were appropriate for the jury to decide. Other circuits have addressed the difficulty of inferring intent in cases involving the uttering of forged checks, and have found evidence very similar to that adduced here sufficient to establish guilt beyond a reasonable doubt. *See, e. g., United States v. Dobson*, 512 F.2d 615 (6th Cir. 1975) (conviction for unlawfully possessing, forging and uttering Treasury checks, where the evidence showed payee never received checks and that the defendant cashed the checks containing forged endorsements). *See also, United States v. Beechum*, 555 F.2d 487 at 499 (5th Cir. 1977), *conviction aff'd and opinion vacated on other grounds*, 582 F.2d 898 (1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

The evidence as it stood at the close of the government's case was sufficient, when taken as a whole, to sustain a verdict of guilt beyond a reasonable doubt. The district judge properly denied defendant's motion for judgment of acquittal.

### III.

■ Defendant argues that he was denied the right to fully develop his theory of the case when the district court limited his cross-examination of Mr. Spyropoulos, the restaurant owner who cashed the checks. The district court sustained the government's objection to defense counsel's question whether or not Mr. Spyropoulos "consider[ed] it a good business practice to take a check from somebody when you did not know who had signed it and it was not signed in your presence by the person who gave it to you." The district court ruled that "it doesn't make any difference what [Mr. Spyropoulos] thought was the business practice because nothing like that is relevant or material."

Defendant asserts that the "business practice" evidence was essential to his theory that it was unreasonable for a restaurant owner to accept a check under the circumstances involved in this case. Defendant points out that his fingerprints were not found on the checks. This, he says, suggests that Mr. Spyropoulos cooperated in accepting the check from some other person

---

7. We note that the sentencing hearing conducted in this case reveals that defendant was illiterate and could write only his own name.

and merely "framed" defendant when later recipients of the checks discovered the forgeries.

It appears from a careful reading of the transcript that the district judge and defense counsel may not have understood each other regarding the nature of the testimony sought. The district judge possibly understood counsel's question to delve into the business community's usual practice in regard to checks; defense counsel apparently intended that the question explore Mr. Spyropoulos's own business practices. It does not appear that the trial judge intended to limit defense counsel's development of its theory of the case, but instead sought quite properly to limit solicitation of the witness' opinion as to business practices at large, not what his own practices were. *United States v. Ellison*, 557 F.2d 128, 134–35 (7th Cir. 1977). The possible misunderstanding from the ambiguous question did not prejudice defendant. There already was a great deal of evidence in the record to the effect that the usual practice of the partnership that owned the restaurant was to make liable any partner who accepted a bad check. The defense took advantage of its opportunity to point up the lack of information Mr. Spyropoulos had before cashing the checks, as well as the fact that bad checks were a constant problem at the restaurant. Defense counsel set out the significance of this testimony for the jury at closing argument. Defendant thus was able to raise any material points he wished to raise in order to develop his case. Defendant has not suggested what further information he might have elicited, which would not be cumulative, had the district judge ruled other than he did.

■ Defendant also contends that the district judge erred in refusing to tell the jury that the court had taken judicial notice of the Illinois law governing civil liability on checks.[8] Defendant's purpose in seeking to introduce the Illinois statute was to highlight the attack on Mr. Spyropoulos's credibility by suggesting that it was unlikely the restaurant owner would not secure defendant's written endorsement on the checks, if indeed it was defendant who brought the checks to him. We reject defendant's contention. There is no dispute about the meaning of the state statute and its significance is collateral to the case. The district court did not limit defendant's opportunity to argue the significance of the doctrine embodied in the state statute. *See United States v. McDonald*, 576 F.2d 1350 (9th Cir.), *cert. denied, sub nom. Stewart v. United States*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978). Indeed, in closing argument defense counsel said that "everyone knows" a person is not liable on a check that does not contain that person's signature. Moreover, defendant suffered no prejudice from the trial court's failure to inform the jury that he judicially noted the statute, since Mr. Spyropoulos testified that the arrangement with his fellow owners made him liable on any bad checks he approved on behalf of the restaurant. Everyday business practice is as important, and probably more so, than state laws defining civil liability. *See generally* J. White & R. Summers, Uniform Commercial Code 6–7. (1972). In this case, when taken in context with the final argument, there was no error in the court's refusal to accede to defendant's request.

■ Defendant next contends that the district court erred in refusing defendant's instruction on the elements of the offense. Defense counsel were most concerned that the jury be instructed that it must find that the check was passed by means of a fraudulent representation that the payees' endorsements were genuine. A comparison between the instruction the judge gave[9]

---

8. In defense counsel's words, "This statute provides that no one is liable on a check unless his signature appears in some manner on the check." Appellant's brief at p. 36, citing Ill. Rev.Stat. ch. 26, § 3–401.

9. The district judge gave the following instruction in describing the elements of the crime:
 The phrase "utters or publishes as true", as used in the statute, means to make or attempt any use of a written or printed instrument or document, such as an attempt to place a check in circulation, whereby, or in

and that requested [10] by defendant shows that the given instruction contained the element sought by defendant. The district judge was not required to give the instruction in the form and language requested by defendant. *United States v. Martin*, 507 F.2d 428 (7th Cir. 1974).

During final argument government counsel indicated that even if defendant had given the checks to Mr. Spyropoulos with the latter's knowledge that they either were stolen or forged, defendant still would be guilty of the crime charged. Defendant claims that the prosecutor's argument misstated the law, and says the district court erred in refusing defendant's request for a corrective instruction. The contention apparently is that since a fraudulent assertion about the genuineness of the check is an essential element of "uttering" a forged check in violation of 18 U.S.C. § 495, *United States v. Brown*, 495 F.2d 593 (1st Cir.), *cert. denied*, 419 U.S. 965, 95 S.Ct. 226, 42 L.Ed.2d 179 (1974); *United States v. Hyatt*, 565 F.2d 229 (2d Cir. 1977), there could be no fraudulent aspect to defendant's representations if Mr. Spyropoulos knew the check was forged.

■■■ This argument misperceives the requirement for a fraudulent assertion under § 495. It is irrelevant whether or not Mr. Spyropoulos believed that the endorsements were forged; the only issue is whether defendant in some manner falsely represented that the checks were genuine, intending

that Mr. Spyropoulos rely on that representation. *Compare Williams v. United States*, 368 F.2d 972, 975 (10th Cir. 1966) ("fraudulent representation" in context of mail fraud scheme under 18 U.S.C. § 1341). The evidence was sufficient to establish that fraudulent representations were made. There was no evidence to suggest that defendant and Mr. Spyropoulos were engaged in a conspiracy or that defendant was aiding or abetting some scheme by Mr. Spyropoulos to utter forged checks, *see* 18 U.S.C. § 2, in which case the restaurant owner's state of mind might become important. The *Hyatt* case is not on point, since there the court held that no false representations had been made at all when the defendant discounted Treasury checks to an undercover agent. Here, as we discussed earlier, there was ample evidence of defendant's false representations.

The prosecutor's statements during closing argument were not inaccurate. Defendant thus was not entitled to a jury instruction that contradicted those statements.

### IV.

Defendant contends that the district court's rejection of his request for an instruction on the presumption of innocence was error. The district judge said that he did not think that "this case warrants a complex instruction of the kind being rendered" by defendant.[11]

connection with which, some assertion, representation or claim is made to another in some way or manner, directly or indirectly, expressly or impliedly, or by words or conduct, that the check or document is genuine.

**10.** Defendant had requested the following instruction on the elements of the crime, and objects to the judge's refusal to include the third "element":

Four essential elements are required to be proved in order to establish the offense of uttering charged in Counts One and Two of the indictment:

*First*: The act or acts of placing or offering to place in circulation the United States Treasury checks described in Counts One and Two of the indictment;

*Second*: Doing such act or acts with knowledge that the payee's endorsement on

the reverse side or back of the check was a forgery;

*Third*: Doing such act or acts by means of a fraudulent representation that the payee's endorsement is genuine; and

*Fourth*: Doing such act or acts willfully, and with the intent to defraud the United States.

As stated before, the burden is always upon the prosecution to prove beyond a reasonable doubt every essential element of the crime charged; the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

**11.** Defendant's proposed instruction No. 5, taken verbatim from Devitt & Blackmar, Federal Jury Practice and Instructions, § 11.14, reads as follows:

Defendant argues that the instruction on the presumption of innocence was needed to counteract the prejudice that stemmed from other alleged errors in the trial already discussed. Defense counsel recognize that it is the totality of the circumstances that determines whether the omission of an instruction on the presumption constitutes error. *Kentucky v. Whorton*, 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640, *reh. denied*, 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979).

At the outset it should be noted that the district judge did not refuse to give a presumption instruction; rather, he felt that the tendered instruction, linked as it was to a discussion of burden of proof and reasonable doubt was too lengthy and involved. Defense counsel did not offer to shorten and extract the presumption of innocence instruction, but apparently offered only to provide a shorter version of that portion of the defendant's tendered instruction defining reasonable doubt. We must look at the purpose of the instruction on the presumption of innocence to determine whether the failure to give it in this case deprived defendant of a fair trial. So far as we have been able to find, this is the first time this circuit has dealt with the presumption instruction since the *Whorton* case was decided.

In *Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), the Court reversed a criminal conviction where the trial judge refused to give a presumption of innocence instruction. The Court traced the history and justification for the presumption, and concluded that the concepts of presuming a defendant's innocence and of requiring the prosecution to prove guilt beyond a reasonable doubt are not "logically separate and distinct." 436 U.S. at 483, 98 S.Ct. at 1934. Instead, the presumption emphasizes the principle that the government bears the burden of producing evidence sufficient to establish guilt beyond a reasonable doubt. In addition, an instruction on the presumption "simply represents one means of protecting the accused's constitutional right to be judged solely on the basis of proof adduced at trial." 436 U.S. at 486, 98 S.Ct. at 1935. *See Whorton*, 441 U.S. at 790–91, 99 S.Ct. at 2090. (Stewart, J., dissenting). In this case, the district court repeatedly stated the prosecution's burden and the standard of reasonable doubt by which the jury should consider the evidence. The court defined the reasonable doubt standard[12] and described the government's burden no less than six times in the course of instructing the jury, tying that burden specifically to the elements of the crime charged. The court also charged the jury that it should consider only the evi-

The law presumes a defendant to be innocent of crime. Thus a defendant, although accused, begins the trial with a "clean slate" —with no evidence against him. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. So the presumption of innocence alone is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate

to rely and act upon it in the most important of his own affairs.

The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant; for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

So if the jury, after careful and impartial consideration of all the evidence in the case, has a reasonable doubt that a defendant is guilty of the charge, it must acquit. If the jury views the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury should of course adopt the conclusion of innocence.

12. In defining reasonable doubt, the court accepted defendant's revision of its original, lengthy proposed instruction, which is taken from § 11.14 of Devitt & Blackmar's pattern jury instructions.

dence developed at the trial and only for conduct alleged in the indictment. The record is clear that the jury was instructed thoroughly that the burden always is on the prosecution to prove guilt beyond a reasonable doubt on the basis of evidence brought out during the trial.

In the *Taylor* case, the Court looked to the entire context of the trial in concluding that the failure to provide an instruction on the presumption of innocence mandated reversal. The Court made clear in the *Whorton* case that it was the specific facts in *Taylor* that had prompted reversal in the latter case. The prosecutor in the *Taylor* case repeatedly had made reference to the defendant's status as a defendant, "implied that all defendants are guilty and invited the jury to consider that proposition in determining [defendant's] guilt or innocence." 436 U.S. at 487, 98 S.Ct. at 1935. The trial court's entire set of jury instructions were "skeletal," *id.* at 487, 98 S.Ct. at 1935, and included only a few cursory references to the burden on the prosecution to prove guilt beyond a reasonable doubt.

 By contrast, in the case before us there is no claim that the prosecution improperly suggested that the mere fact that defendant was on trial established guilt. It is argued that the alleged "similar bad acts" evidence introduced in this case had the same effect as the prosecutor's comments in *Taylor.* But "similar acts" evidence always will raise that possibility. We do not read the Supreme Court's opinions in *Taylor* and *Whorton* automatically to require the instruction on the presumption of innocence. The prosecutor's improper statements in *Taylor* approached reversible error, *see* 436 U.S. at 487, n. 14, 98 S.Ct. at 1935 n. 14, but that is not the situation in the present case where similar acts evidence was admitted for a proper purpose under Rule 404(b). Considering defendant's opportunity to develop and argue his theories of defense, we cannot say that reversal is mandated for failure to give the requested instruction.

In determining the adequacy of jury instructions, this circuit has had occasion to consider whether or not it is required that the term "reasonable doubt" be defined for the jury. In *United States v. Lawson,* 507 F.2d 433 (7th Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975), the district court had refused to define the term "reasonable doubt." This court upheld the district judge's action, saying "The essential aspect of the matter it appears to us is that the jury clearly understand that there must be proof persuasive beyond a reasonable doubt." 507 F.2d at 442. Mechanical formulations were not required, and in subsequent cases we have questioned the need for the definition at any time. *See, e. g., United States v. Allen,* 596 F.2d 227 (7th Cir. 1979); *United States v. Larson,* 581 F.2d 664 (7th Cir. 1978).

 The concern over inflexible jury instructions, as evidenced by the language quoted from the *Lawson* opinion, has been considered by this court in subsequent cases, *see United States v. Richardson,* 562 F.2d 476 (7th Cir. 1977), and has some pertinence here. It is clear from the *Whorton* case that the absence of an instruction on presumption of innocence is not a constitutional infirmity requiring reversal in all cases. It also is clear that a careful, complete explanation to the jury that the prosecution bears the burden of proof beyond a reasonable doubt is not a "logically separate and distinct" proposition from the presumption of innocence. The *Lawson* court's concern that the jury *in fact* understand the concepts underlying the principles upon which it must base its decision is satisfied here. There is every indication from the record that the jury charge was sufficient to impart to the jury an understanding of the presumption of innocence that is the concomitant of the prosecution's burden of proof. That was sufficient to serve the salutary purposes of the presumption of innocence even apart from "remind[ing] the jury that the prosecutor has the burden of proof beyond a reasonable doubt." 441 U.S. at 790–91, 99 S.Ct. at 2090. (Stewart, J., dissenting).

 This is not to say that an instruction on the presumption of innocence should not be the norm in federal criminal trials.

Indeed the most recent revision of jury instructions for this circuit suggests that the instruction generally should be given. *See* Committee Comment to Seventh Circuit, Fed.Crim. Jury Instructions 2.06. Even so, the Committee Comment notes that the presumption of innocence instruction has in the past frequently been accompanied by "confusing and unhelpful elaboration," *id.*, which appears to have been the problem with the instructions tendered in this case. It is the better practice for the instruction to be routinely given in each case.

Defendant was not deprived of a fair trial due to the absence of an instruction on the presumption of innocence.[13]

## V.

■■ The district court sentenced defendant to a seven year prison term on each count, the sentences to run concurrently, and added a thousand dollar fine for each count. At the request of defense counsel the district court stayed execution of the sentence for sixty days so that counsel and defendant's brother could seek employment for defendant. Sixty days later counsel had not obtained employment for defendant and requested additional time to do so. Counsel also requested that the additional time include thirty days from October 4, 1980, when defendant would be released from the sentence he was serving on an unrelated offense. The district court refused to extend the stay but said that after the appeal process had been exhausted in this case, and if the conviction were upheld, he would entertain defendant's motion under Rule 35

of the Federal Rules of Criminal Procedure to adjust the sentence in order to permit defendant to seek to obtain work, if there was a real possibility that defendant could do so.

Defendant now asserts that the sentence and fine were excessive and that the district court's stay denied defendant due process because in effect it imposed a condition for vacating the sentence with which defendant could not comply since he was in prison and unable to assist the others in securing employment for himself.

The district court's sentence was not an abuse of the discretion accorded the trial judge in sentencing matters. *Williams v. New York*, 377 U.S. 241 (1949); *United States v. Cardi*, 519 F.2d 309 (7th Cir. 1975). Defendant has spent sixteen years of his life imprisoned on ten different convictions. The district court noted that sentencing reports indicated defendant would not benefit from psychiatric treatment. The sentence imposed was within the limits of the statute (*see* footnote 1, *supra*) and under the circumstances was not an abuse of discretion. *United States v. Cardi, supra.*

■■ The district court's indication that it would reconsider the sentence upon a mandate issuing at the end of the appeal in this case was not a denial of due process. The district judge stated that defendant needed structure to his life in order to avoid further trouble with the law, and the court was unwilling to release defendant absent a showing that he immediately would be able to start a job that would provide him with the required structure.[14] The district

---

**13.** Defendant further argues that the district court should have given the following jury instruction:

 If two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, the jury should adopt the one of innocence.

This instruction, which has been the subject of some criticism in this circuit, *see United States v. Richardson*, 562 F.2d 476 (7th Cir. 1977), seems to be another formulation of the presumption of innocence and burden of proof concept. Given our determination that the failure to give a presumption instruction was not reversible error in this case, we conclude that

the failure to give the above-quoted instruction likewise does not require reversal. We note that the most recent revision of this circuit's recommended jury instructions does not include the instruction requested by defendant in this case. *See* Seventh Circuit, Fed.Crim.Jury Instructions.

**14.** Defendant's brother stated that he had come to a new-found understanding with defendant, and suggested that he would participate in overseeing defendant's activities once he was released from prison. Defense counsel also had devoted admirable and diligent attention to this case and to defendant on a personl level.

court's decision to permit defendant to avoid the sentence if he found a job is unusual given defendant's record and the length of the prison term imposed for this crime. It was within the district judge's discretion, however, to state what he thought to be reasonable factors in staying imposition of the sentence should defendant's appeal be decided before the sentence started or reducing the sentence pursuant to a Rule 35 motion once defendant began serving time. The opportunity thus remains open for defendant within 120 days of the final mandate on appeal to present his evidence under Rule 35 that he should be released because he has obtained (or unquestionably will obtain) a job or for any other reason.

We note that even if this were not the case, our conclusion that defendant was not denied due process under this sentencing scheme still would be the same. The terms with which defendant must comply under the court's original stay are clear, cf. *United States v. Atlantic Richfield Co.*, 465 F.2d 58 (7th Cir. 1972) (condition for probation that defendant set up a program to "deal with" oil spillage problems), and there is no indication that it is impossible for defendant to obtain a promise of employment while incarcerated, cf. *United States v. Jimenez*, 600 F.2d 1172 (5th Cir.), *cert. denied*, 444 U.S. 903, 100 S.Ct. 216, 62 L.Ed.2d 140 (1979) (indigent required to pay back costs of appointed counsel). With regard to this latter point, defendant argues that an affidavit by a representative of the Safer Foundation, which helps convicted persons obtain work, shows that defendant can get a job only if he is released from prison to assist in the process. The discussion of the affidavit that appears in the record indicates only that the Foundation is certain that if defendant actually is released he can then obtain a job with the Foundation's help, and not that a job may be found only on defendant's release from custody.

---

These indications of continued concern for defendant apparently prompted the district judge's confidence that the influence of those

## VI.

Defendant's conviction and the sentence imposed pursuant to that conviction are

AFFIRMED.

CUDAHY, Circuit Judge, concurring:

The most troublesome aspect of this case involves the liberal admission of testimony about other "bad acts", ostensibly to show that the defendant had the "opportunity to gain access to the mailboxes and obtain the checks". Panel opinion, *ante* at 5. Although the evidence was relevant only to establish this simple objective fact, it also revealed the extraneous spectacles of the defendant's "arrest" by a security guard (who testified that he "held [the defendant] for the police and called the City police") and of a subsequent (and unrelated) search of the defendant by a police officer at police headquarters.

Perhaps if these events were probative of something as relatively complex and elusive as "consciousness of guilt", see *United States v. Peltier*, 585 F.2d 314, 324–25 (8th Cir. 1978), these embellishments, as conveyed by live testimony, would have been appropriate. But simply to show the plain fact of opportunity to gain access to the checks, a straightforward stipulation would seem to have been equally probative and considerably less prejudicial. Having noted these reservations, however, I am persuaded by Judge Wood's opinion that, on the record before us, the desirability of a stipulation was not pressed to resolution by the defendant, and I concur.

people, coupled with the structure of a job, would keep defendant's behavior within bounds acceptable to society.