755 F.2d 1446
 UNITED STATES of America, Plaintiff-Appellee,
v.
Wilfren CARRASCAL-OLIVERA, Defendant-Appellant.
 No. 84-3441.
 United States Court of Appeals,
Eleventh Circuit.
 March 22, 1985.
 
 Jack R. Blumenfeld, Blumenfeld & Cohen, Coral Gables, Fla., for defendant-appellant.
 Charles Caruso, Asst. U.S. Atty., Tampa, Fla., Janis Kockritz, Appellate Sect., Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before HILL, KRAVITCH and SMITH*, Circuit Judges.
 KRAVITCH, Circuit Judge:
 
 
 1
 Wilfren Carrascal-Olivera was convicted of conspiracy to possess with intent to distribute cocaine, 21 U.S.C. Sec. 846 (count one), and possession with intent to distribute cocaine, 21 U.S.C. Sec. 841(a)(1), and 18 U.S.C. Sec. 2 (count two).[1] In this appeal, he challenges an evidentiary ruling made by the trial court, and the sufficiency of the evidence to support the convictions. We affirm.I. BACKGROUND
 
 
 2
 On January 3, 1984, United States Customs officials conducted a search for contraband aboard the "Carmenia," a freighter that recently had arrived in Tampa, Florida from Turbo, Colombia. Such searches are performed routinely on freighters arriving from foreign countries. During their search, the officials entered the quarters of crewman Ronald Sharpe. They asked Sharpe whether he knew of any contraband aboard the ship. Sharpe replied that another crewman was smuggling four pounds of marijuana. After searching Sharpe's cabin, the officials left to look for the marijuana Sharpe had mentioned. Not finding the marijuana, the officials returned to Sharpe's quarters to question him further. One of the officials opened the door to the closet where Sharpe stored his mattress during the day. The mattress had several stitches along its side. The officials ripped open the stitches and discovered approximately eight kilograms of cocaine, wrapped in plastic bags, packed inside the mattress. After arresting and searching Sharpe, the officials again searched his cabin. The searches revealed two slips of paper, each containing a name and a Miami area telephone number.
 
 
 3
 Sharpe was turned over to Drug Enforcement Agency agents, to whom he explained his possession of the cocaine. While in Colombia, Sharpe related, a woman approached him and asked him if he would transport cocaine from Colombia to the United States. The names and numbers on the slips of paper found after his arrest were those of the individuals Sharpe was instructed to contact upon his arrival. As compensation, Sharpe was to receive three thousand dollars per kilogram when he delivered the cocaine according to the contacts' instructions. In an effort to cooperate with DEA agents, Sharpe telephoned one of the numbers and arranged to meet with Segundo Diaz on January 4. The next morning Sharpe and DEA Agent Ronald Boston drove to the scheduled meeting place, but Diaz never showed up. Assuming Sharpe's role, Boston called one of the numbers and was told to call back later; when he did, he was given two more phone numbers. Boston dialed one and spoke with Jose Sanchez, who identified himself as a "friend of Segundo's" and agreed to meet Boston that evening. Boston asked Sanchez to have Segundo call to confirm the meeting, which Segundo did.[2] Boston arrived at the meeting place at the prearranged time, this time without Sharpe. When no one else arrived for this meeting either, Boston returned to his office, where he received a call from Sanchez, who explained that "they were having problems leaving Miami" and that they would be ready to meet with him the next day.
 
 
 4
 At ten o'clock the next morning, January 5, Sanchez called Boston to say that he had arrived in Tampa. They agreed to meet at a hotel with which Boston was familiar. Boston drove to the hotel, followed by several other DEA agents. In the hotel lobby, Boston, still posing as Sharpe, met Sanchez, while the other agents set up surveillance posts. Sanchez explained that Segundo sent him and that "he and his people were having some trouble, some difficulty obtaining the money." According to Sanchez, two of the five individuals who were going to "invest" in the cocaine smuggled by Sharpe had backed out. Sanchez asked Boston whether he could stay in the area for three or four days while they obtained the money necessary to pay him. Boston replied that his ship was leaving that day, but that he might be able to stay with a friend. Under the pretense of calling his friend, Boston left Sanchez to phone another DEA agent concerning the postponement of the transaction. Upon Boston's return, Sanchez stated that there was a strong possibility he would have the money that day, but that he would have to wait for his people in Miami to contact him. Sanchez also assured Boston that the compensation for his services would be three thousand dollars per kilogram. The two then parted, Boston going back to his office, and Sanchez driving to a motel about two miles away. DEA agents followed Sanchez to his motel, where they again set up surveillance.
 
 
 5
 At one o'clock that afternoon, appellant and Jose Palacio-Palaez drove into the motel parking lot, parked outside Sanchez' room, and entered the room. Two hours later, Sanchez phoned Boston to say that his friends were with him and that he had some money. They agreed to meet at the hotel where they had spoken that morning. Appellant, Sanchez, and Palacio-Palaez drove to the hotel, followed by the agents. When Boston arrived, he encountered Sanchez and appellant in the hotel lobby. Boston asked Sanchez if they had the money; Sanchez spoke to appellant in Spanish,[3] and appellant held up a paper bag he was carrying. Sanchez suggested that they walk to the car, where Palacio-Palaez was waiting. At the car, appellant tapped on the window. Palacio-Palaez slid over, revealing several hundred dollars lying on the car's front seat. Appellant then opened the paper bag to reveal its contents: a large sum of money. Sanchez told Boston there was "about twenty thousand dollars" in the bag, and asked Boston about the cocaine.[4] Boston suggested that they drive over to his car, where he had left the cocaine. Sanchez turned to appellant and conversed with him in Spanish, and then told Boston to get the cocaine and bring it back to them. Boston agreed, but instead walked to the front of the hotel and signaled the other agents, who moved in and effected the arrests.
 
 
 6
 II. WHETHER THE DISTRICT COURT ERRED BY ADMITTING INTO EVIDENCE STATEMENTS MADE BY APPELLANT'S ALLEGED COCONSPIRATORS
 
 
 7
 Appellant contends that the several statements of Sanchez admitted into evidence were hearsay, and not within any exception. Rule 801(d)(2)(E) defines as nonhearsay a statement that is offered against a party and is "a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). For the statements to have been admissible under this rule, the trial judge must have been satisfied, by substantial evidence independent of the statements themselves, (1) that a conspiracy existed, (2) that Sanchez and appellant were members of that conspiracy, and (3) that the statements were made during the course of and in furtherance of the conspiracy. United States v. Castro, 723 F.2d 1527, 1532 (11th Cir.1984); United States v. James, 590 F.2d 575 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).[5] Appellant charges that the government failed to sustain its burden because the evidence independent of the statements shows only that he was present at the scene of the transaction and nothing more. We disagree.
 
 
 8
 According to Agent Boston, there was no money offered to him in exchange for the cocaine until appellant entered the picture. Appellant was observed entering Sanchez' motel room just prior to the time Boston met Sanchez, appellant, and Palacio-Palaez to make the exchange. No one else was seen entering or leaving Sanchez' motel room during that period. Although appellant neither spoke nor understood English, his own actions indicated that he was fully aware of what was taking place. He carried the bag containing the money, then held up the bag, after Boston asked for the money and Sanchez spoke to appellant in Spanish. Once they moved from the hotel lobby to the car, appellant opened the bag so that Boston could see the money inside, apparently without any prompting. We conclude that there was substantial evidence independent of Sanchez' statements to establish a conspiracy between appellant and Sanchez. In addition, Sanchez' statements clearly were made in furtherance of the conspiracy. Finally, as we explain in Part III B, infra, the statements were made during the course of the conspiracy. Therefore, the court below did not err by admitting Sanchez' statements against appellant.
 
 
 9
 III. WHETHER THERE IS SUFFICIENT EVIDENCE TO SUSTAIN APPELLANT'S CONVICTIONS
 
 A. Conspiracy
 
 10
 Appellant urges that we reverse his conviction on the conspiracy count because the government did not introduce sufficient evidence to link appellant to the charged conspiracy. The prerequisites to a finding of guilt on a drug conspiracy count are proof that two or more persons agreed to commit a drug-related offense, that the defendant knew of this conspiracy, and that he agreed to become a member. United States v. Marszalkowski, 669 F.2d 655, 661 (11th Cir.), cert. denied, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982). The existence of these elements may be established through circumstantial evidence. United States v. Blasco, 702 F.2d 1315 (11th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983). The standard of review requires that we consider the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and affirm the conviction if a "reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir.1982) (Unit B) (en banc), aff'd on other grounds, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[6] The evidence may be sufficient even though it does not "exclude every reasonable hypothesis of innocence, or is not wholly inconsistent with every conclusion except that of guilt...." Id. Moreover, "A jury is free to choose among reasonable constructions of the evidence." Id.
 
 
 11
 Here, the evidence reveals that Sharpe was directed to contact certain individuals who, upon his delivery of the cocaine according to their instructions, would pay the money promised to him for transporting the cocaine from Colombia. One of the contacts, Sanchez, explained that some of the "investors" had backed out, but that his people in Miami would be contacting him and he might have the money later that day. Shortly after appellant appeared at Sanchez' motel, Sanchez phoned Boston to arrange to complete the transaction, stating that his friends had arrived and he had the money. It was appellant who carried the bag containing the money into the hotel lobby, and who held it up when Boston asked about the money and Sanchez spoke to him in Spanish. Boston observed several large bills on the front seat of the car in which appellant and Palacio-Palaez drove to meet Sanchez, indicating that the money was transported in that vehicle. Appellant also displayed the contents of the bag to Boston, after they had walked to the parking lot. Finally, when Boston proposed that they drive together to Boston's car to make the exchange, Sanchez offered an alternative, but not until he conversed with appellant in Spanish.
 
 
 12
 Based upon the evidence presented, a reasonable juror could conclude that appellant was more than "merely present" at the scene. Rather, appellant's behavior, viewed in the totality of the circumstances surrounding the transaction, indicates that he was an active participant in the conspiracy, well aware of the purpose for which the money was to be used. Cf. United States v. Blessing, 727 F.2d 353, 357-58 (5th Cir.1984) (evidence that codefendant travelled to defendant's home after telling a government agent that he wanted to take samples to his "money people," and that defendant was seen depositing a bag filled with money at the site of the transaction, was sufficient to link defendant to conspiracy); United States v. Alvarez, 696 F.2d 1307, 1310-11 (11th Cir.) (evidence that Spanish-speaking defendant was present at the site of negotiations, which were translated for him, told a government agent to retrieve a drug sample from his car, and was present when the drugs were transferred, was sufficient to convict defendant of conspiracy), cert. denied, 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1983). Unquestionably, the object of this conspiracy was to possess cocaine, and an intent to distribute can be inferred from the amount of cocaine, eight kilograms, with which Sharpe was entrusted. United States v. Thomas, 676 F.2d 531, 535 (11th Cir.1982). We hold, therefore, that there is sufficient evidence to sustain the conviction on count one.
 
 B. Possession
 
 13
 Finally, appellant challenges his conviction on count two, the substantive offense of possession with intent to distribute cocaine. It is clear that appellant never had actual possession of cocaine during this transaction because the DEA agents made the arrests before Boston turned over the cocaine. Nevertheless, the government argues that under Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), appellant is liable as a member of the conspiracy for the possession by his coconspirator Sharpe, because the possession was in furtherance of the conspiracy, was within its scope, and was a reasonably foreseeable consequence of the agreement. See also United States v. Hodges, 606 F.2d 520, 523 (5th Cir.1979). Appellant counters that one cannot be criminally liable "for substantive offenses which were committed in furtherance of the conspiracy before he joined it or after he withdrew from it." United States v. Harrell, 737 F.2d 971, 981 (11th Cir.1984) (quoting Gradsky v. United States, 376 F.2d 993, 996 (5th Cir.), vacated in part on other grounds, 389 U.S. 18, 88 S.Ct. 1, 19 L.Ed.2d 18, cert. denied, 389 U.S. 908, 88 S.Ct. 224, 19 L.Ed.2d 224 (1967)). Appellant argues that Sharpe's possession of the cocaine terminated when Sharpe was arrested on January 3, and that the evidence does not establish appellant's own involvement in the transaction until January 5, when he appeared at Sanchez' motel.
 
 
 14
 In Harrell, a panel of this court reversed appellant Hawkins' conviction for violation of the Travel Act, 18 U.S.C. Sec. 1952. The alleged violation stemmed from a four-year conspiracy to distribute drugs on numerous occasions, and involved drug courier runs that occurred prior to the time the evidence showed Hawkins' participation in the conspiracy. 737 F.2d at 980-81. The court ruled that the evidence was not sufficient to establish Hawkins' direct participation in the crimes. Id. at 981. Moreover, although Hawkins had been convicted on a conspiracy count arising from the drug distribution scheme, the court observed that he could not be criminally liable for substantive offenses committed and completed before he joined the drug-trafficking conspiracy. Id.
 
 
 15
 In the present case, there is evidence from which the jury could have inferred appellant's involvement at least as early as January 3, and perhaps even earlier. The evidence produced at trial indicates that the conspiracy involved a single cocaine transaction between persons in Colombia and in the United States. The method chosen to effectuate the transaction was to entrust Sharpe, who thereby became a member of this conspiracy, with transporting the cocaine from Colombia to the United States, where he was to contact the designated individuals from whom he would receive compensation for his services. Sharpe's role in the scheme was that of a "runner" or "mule." The cocaine was not his to sell to whomever he chose, nor was he instructed to sell the cocaine to the contacts--he was told simply to deliver it according to their instructions.[7] These contacts, some of who we know were involved as of the time Sharpe received the cocaine in Colombia, expected Sharpe's arrival with the cocaine, and their actions confirmed this expectation. Sharpe's possession of the cocaine, then, was not only in furtherance of the conspiracy, it was necessary to accomplish the conspiracy's goal.
 
 
 16
 Although there is no direct evidence that appellant was one of the individuals whom Sharpe was instructed to contact upon his arrival, circumstantial evidence indicates that he participated in the conspiracy before January 5, when DEA agents observed him enter Sanchez' motel room. Sanchez stated that initially there were five individuals who were going to "invest" in the cocaine, two of whom subsequently withdrew their participation. Further, shortly before appellant arrived at the motel, Sanchez told Boston that he would be hearing from his people in Miami and that the money might be available that afternoon. Given the nature of the entire scheme, it was reasonable for the jury to infer from the evidence that appellant was involved in the conspiracy on or before January 3, the date of Sharpe's arrest. That appellant had no contact with Sharpe and did not know that Sharpe was the individual entrusted to deliver the cocaine from Colombia is not relevant to the inquiry. See United States v. Diaz, 655 F.2d 580, 585 (5th Cir.1981), cert. denied, 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982).[8]
 
 
 17
 We conclude, therefore, that the evidence is sufficient to sustain appellant's conviction under Pinkerton. Because a jury could find beyond a reasonable doubt that the evidence established appellant's involvement as of January 3, we need not consider appellant's claim that he cannot be criminally liable for substantive offenses committed before his participation in the conspiracy.
 
 
 18
 For the foregoing reasons, we conclude that appellant's claims are without merit. The convictions are therefore AFFIRMED.
 
 
 
 *
 Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 The three-count indictment in addition charged Jose Sanchez and Ronald Sharpe in counts one and two. Count three charged Sharpe with importation of cocaine, 21 U.S.C. Sec. 952
 
 
 [2]
 Boston gave Sanchez the number for the "undercover" phone at the DEA office. Agents who answered this phone, which was separated from other phones in the office, would initiate telephone conversations by saying "hello," instead of the name of the department
 
 
 [3]
 Appellant neither speaks nor understands English. Agent Boston testified that he did not understand Spanish
 
 
 [4]
 It was later determined that there was $18,000 in the bag, and $800 lying on the car seat
 
 
 [5]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [6]
 We are bound by decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981. Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir.1982)
 
 
 [7]
 This fact was corroborated by the amount of money promised to Sharpe, and by the amounts found in the bag and in the car at the transaction site. One of the DEA agents testified that "mules" are usually paid between $2,500 and $3,000 per kilogram
 
 
 [8]
 The Harrell court relied upon the Solicitor General's concession in Levine v. United States, 383 U.S. 265, 86 S.Ct. 925, 15 L.Ed.2d 737 (1967), that "an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual has joined...." Id. at 266, 86 S.Ct. at 925; Harrell, 737 F.2d at 981. Several other courts have been reluctant to sustain criminal responsibility under Pinkerton in situations similar to Harrell, based upon the same concession. See United States v. Covelli, 738 F.2d 847, 859 (7th Cir.1984); United States v. Knippenberg, 502 F.2d 1056, 1059 (7th Cir.1974); see also Gradsky, 376 F.2d at 995-96, on remand from, Levine, supra
 On the other hand, courts consistently have stated that one who joins a conspiracy in progress with knowledge of the unlawful enterprise is responsible for coconspirators' actions occurring before his or her association. See, e.g., Covelli, 738 F.2d at 859 n. 16; United States v. Davis, 666 F.2d 195, 200 (5th Cir.1982) (Unit B); United States v. Jackson, 627 F.2d 1198, 1212 n. 30 (D.C.Cir.1980); United States v. Michel, 588 F.2d 986, 1002 (5th Cir.), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); United States v. Guillette, 547 F.2d 743, 751 (2d Cir.1976), cert. denied, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977); United States v. Bridgeman, 523 F.2d 1099, 1107-08 (D.C.Cir.1975), cert. denied, 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206 (1976); United States v. Reynolds, 511 F.2d 603, 607 (5th Cir.1975); United States v. Brown, 495 F.2d 593, 599 n. 5 (1st Cir.), cert. denied, 419 U.S. 965, 95 S.Ct. 226, 42 L.Ed.2d 179 (1974). These courts, however, were considering the claims of individuals convicted of conspiracy; one who joins a conspiracy after its formation can be just as guilty of the conspiracy as his or her predecessors in crime. Thus, coconspirators' acts done prior to the defendant's association may be considered in conspiracy prosecutions to establish the scope or object of the conspiracy, see, e.g., Michel, supra, Guillette, supra; Reynolds, supra; Brown, supra, or to establish venue for a prosecution, see Davis, supra.
 The courts' refusal to extend Pinkerton liability for substantive criminal acts to coconspirators who were not part of the conspiracy when the crime was completed may stem from due process concerns about vicarious guilt in attenuated circumstances. See United States v. Alvarez, 755 F.2d 830, 849-851 (11th Cir.1985); United States v. Johnson, 730 F.2d 683, 690 n. 8 (11th Cir.1984); United States v. Moreno, 588 F.2d 490, 493 (5th Cir.), cert. denied, 441 U.S. 936, 947, 99 S.Ct. 2061, 2168, 60 L.Ed.2d 666 (1979). Nevertheless, such concerns are not present in this case. There is sufficient evidence that appellant was a coconspirator of Sharpe at the time Sharpe's possession terminated.