[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 23, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14801
Non-Argument Calendar

_____

D. C. Docket No. 08-60024-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VERNON DANIELS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 23, 2009)

Before BIRCH, HULL and FAY, Circuit Judges.

PER CURIAM:

Vernon Daniels appeals his convictions and sentences for conspiracy to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a), ("Count 1"); conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, ("Count 2"); attempt to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 ("Count 3"); conspiracy to carry a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(o), ("Count 4"); and carrying a firearm during and in relation to a drug trafficking crime, ("Count 5"). Daniels argues that the evidence introduced at trial was insufficient to sustain his convictions. He also argues that the district court erred in refusing to reduce his sentences below the applicable statutory minimums based on (1) sentencing factor manipulation and (2) the disparity between his sentence and the sentences of his codefendants. For the reasons set forth below, we affirm.

## I. Background

Daniels and two codefendants, Geary Lynch and Leroy Baines, were charged with conspiracy to interfere with interstate commerce by robbery; conspiracy to possess with intent to distribute five kilograms or more of cocaine; attempt to possess with intent to distribute five kilograms or more of cocaine; conspiracy to carry a firearm during a drug trafficking crime; and carrying a

2

firearm during and in relation to a drug trafficking crime. Daniels pled not guilty to all counts.

On the first day of trial, Michael Connors, a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, ("ATF"), testified that, in November 2007, his agency received information from a confidential informant ("CI") that Lynch was "looking to commit an armed home invasion." On December 7, 2007, Connors met with Lynch, told him that he worked for a narcotics organization and, once a month, picked up 10 to 15 kilograms of cocaine, which he would then transport north. Connors told Lynch that the cocaine pick-up location changed frequently, but that the cocaine was always located in a vacant house. Connors also informed Lynch that he never knew when the cocaine would be available for pick-up until he received a phone call telling him to pick up the cocaine the next day. Connors told Lynch that he regularly saw 20 to 25 kilograms of cocaine in the stash houses and that the cocaine was always guarded by two men armed with handguns. Connors explained that he had not received money that he was promised, so he was "looking for an experienced crew" to rob the stash house of the cocaine. Connors testified that Lynch stated that "this is what he does for a living" and mentioned that a man named Leroy would help him with the robbery.

Connors again met with Lynch on December 19, 2007, so that he could meet

3

Lynch's "crew." Lynch arrived at the meeting with Daniels and Baines. Connors explained the same set of facts that he had explained to Lynch and stated that he needed people who were experienced and "could take care of this." During this conversation, Lynch, Daniels, and Baines were standing around Connors in "a pretty tight circle." Connors testified that Daniels was "just standing there acknowledging what [Connors] was saying. [Daniels] would nod his head participating in the conversation more with his body language than saying anything."

Connors explained to the men that he usually received a call around eight or nine o'clock at night telling him where to pick up the cocaine. He stated that two men carrying handguns were always in the stash houses. Connors testified that Daniels listened to the conversation and never walked away from the men. At one point, Lynch stated that "they were going to put a bullet in" the two armed men in the stash house. According to Connors, "when Lynch said that, [Daniels and Baines] were just standing next to me nodding, just, you know, participating in the conversation." During the December 19th meeting, the men agreed that Connors would supply a rental car as the getaway vehicle and, after the robbery, Lynch, Baines, and Daniels would dump the car and leave five kilograms of cocaine inside for Connors.

4

On January 15, 2008, Connors told Baines, over the telephone, that the robbery would happen the following day. That same day, Connors met Baines, Lynch, and Daniels, although Daniels stood at a distance, holding Lynch's child. Daniels was looking in Connors's direction. During this meeting, Lynch assured Connors that the men were still going to execute the robbery the next day and that "it was going to be Baines, Lynch, Daniels and one other younger guy." Connors had no contact with Daniels during this meeting. The men agreed that Connors would call Baines the following day and give the men a time and place to meet, at which point they would retrieve the rental car and commit the robbery.

On January 16, 2008, Connors called Baines and arranged to meet him at a gas station. Connors arrived at the gas station around 8:00pm, called Baines, and Baines, driving a dark-colored SUV, followed Connors to the ATF's undercover business location. Lynch, Baines, Daniels, and two other individuals Connors had never met, exited the SUV. The men entered the undercover business location and began discussing the plans for the robbery.

The government played video footage of the January 16th meeting. The videotape showed the following. Connors explained to the men that he would enter the house and pick up the cocaine. He stated that, once he was inside the house, he would call Lynch, and tell him, in code, how many men were in the

5

house. Later, Daniels stated "I got a question. When you usually go, are there any other rooms in the house with closed doors?" Connors responded that there were not and that the houses were always vacant. Daniels replied "So, like, when you go in there you never see the other rooms or nothin'?" Connors stated that he had only been on the first floor of the houses and that he had never seen anyone other than the two men. Lynch then stated that he did not care who was in the house, he just wanted to get inside the house, take the cocaine, and get paid. Eventually, agents entered the room and arrested the men.

After the arrest, Connors read Daniels his Miranda[1] warnings and Daniels agreed to speak. The court admitted into evidence Daniels's written statement, which read as follows:

> Question: Do you understand why you are under arrest?
>
> Answer: For conspiracy to rob the stash house of the cocaine. . . .
>
> Question: Did you know [Baines] had three guns on him?
>
> Answer: Yes. . . .
>
> Question: Who is going to get a gun?
>
> Answer: I don't know. Whoever [Baines] picked. . . .
>
> Question: What were you going to do with the cocaine?

---

[1]Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6

Answer: Sell it. . . . [2] We didn't have it lined up yet, though. All I knew is we were going to give you yours.

. . . .

Question: Who is going into the stash house?

Answer: To my knowledge, everybody. . . .

Daniels wrote his initials next to each of these responses and signed and dated the statement.

On cross-examination, Connors explained that he followed ATF protocol for determining the parameters of the sting operation, including how much cocaine was supposedly located in the stash house. Connors had not been shown any firearms prior to the January 16th meeting and, prior to Baines's arrest, Baines had never exposed the three guns he was carrying on his person. Connors testified that, after Baines was arrested, Baines stated that he was going to keep two of the firearms for himself and was not sure who was going to get the third firearm. Connors testified that Lynch told him, in his post-arrest interrogation, that he was going to sell the stolen cocaine in Philadelphia.

Leonard Coy, a special agent with the ATF, testified that on January 16th, agents recovered a waistband holster, three firearms, an extra magazine, and six

---

[2]The words "I assumed" were subsequently inserted before this answer and Daniels initialed this correction.

7

rounds of .38 caliber ammunition on Baines's person.  The weapons recovered

from Baines were loaded.

Matthew Finstad, a police officer with the Fort Lauderdale Police

Department, testified that he conducted surveillance of the December 19th

meeting.  He observed Lynch, Baines, and Daniels standing very close to Connors

and was "able to see body language and movement. . . . [and] there appeared to be

conversation."  After Finstad's testimony, Daniels moved for a judgment of

acquittal on all counts.  The court denied the motion and the jury found Daniels

guilty on all five counts.

The presentence investigation report ("PSI") assigned Daniels an offense

level of 34, a criminal history category of I, and a guideline imprisonment range of

151 to 181 months.  The PSI noted that Daniels was subject to an imprisonment

range of 0 to 20 years on Count 1, pursuant to 18 U.S.C. § 1951(a); a mandatory

minimum term of 10 years' imprisonment on Counts 2 and 3, pursuant to 21

U.S.C. § 841(b)(1)(A); an imprisonment range of 0 to 20 years on Count 4,

pursuant to 18 U.S.C. § 924(o); and a mandatory minimum term of 5 years'

imprisonment on Count 5, to run consecutively with any other term of

imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(A).

At the sentencing proceeding, the court granted Daniels a role reduction

under § 3B1.2. This reduction also reduced the amount of drugs for which Daniels was responsible, resulting in a total offense level of 29 and a guideline imprisonment range of 87 to 108 months. The court noted that Daniels was subject to a statutory mandatory minimum penalty of 10 years on Counts 2 and 3 and a 5-year consecutive mandatory minimum on Count 5, and Daniels agreed with this statement. The court stated that it had considered the 18 U.S.C. § 3553(a) sentencing factors, determined that the mandatory minimum sentences were reasonable and sufficient, and sentenced Daniels to 108 months on Count 1; 120 months on Counts 2 and 3, to run concurrent with Count 1; 108 months on Count 4, to run concurrent with Counts 1-3; and 60 months on Count 5, to run consecutive to Counts 1-4, for a total of 15 years' imprisonment. Neither party objected to the sentence after the court asked for objections.

## II. Law and Analysis

*Sufficiency of the Evidence*

We review <u>de novo</u> challenges to the sufficiency of the evidence in criminal cases. <u>United States v. Futrell</u>, 209 F.3d 1286, 1288 (11th Cir. 2000). "[We] must view the evidence in the light most favorable to the government, drawing all reasonable inferences and credibility determinations in favor of the verdict." <u>United States v. Simpson</u>, 228 F.3d 1294, 1299 (11th Cir. 2000). "A conviction

must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." United States v. Byrd, 403 F.3d 1278, 1288 (11th Cir. 2005).

### A. 18 U.S.C. § 1951 (Hobbs Act) : Count 1

"The Hobbs Act prohibits the attempt of conspiracy to obstruct, delay, or affect commerce by robbery or extortion." United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir.), cert denied, 128 S.Ct. 130 (2007); see 18 U.S.C. § 1951. Section 1951(a) of the Hobbs Act provides that:

> [w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). To prove a Hobbs Act conspiracy, the government must prove that: "(1) two or more persons agreed to commit a robbery encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal." United States v. To, 144 F.3d 737, 747-48 (11th Cir. 1998).

With respect to the first element, Daniels argues that the robbery of the stash house was not encompassed within the Hobbs Act, because the stash house and

10

cocaine did not actually exist and, therefore, the robbery would not affect interstate commerce. See id. We have previously rejected such an argument. See Taylor, 480 F.3d at 1027 (holding that the interstate commerce jurisdictional requirement for a Hobbs Act conviction is met even if the narcotics involved in a sting operation are "fictitious"); United States v. Orisnord, 483 F.3d 1169, 1177 (11th Cir. 2007) (upholding a Hobbs Act conspiracy conviction based on a sting operation involving the robbery of a stash house of a narcotics organization, even though both the narcotics and the organization were "fictitional"). Accordingly, the interstate commerce element is met and the robbery was encompassed within the Hobbs Act. See To, 144 F.3d at 747-48.

The government also met its burden of proving that Lynch, Baines, and Daniels agreed to commit the robbery, that Daniels knew of the conspiratorial goal, and that Daniels voluntarily participated in helping to accomplish the goal. At trial, Connors testified that Lynch recruited Baines and Daniels to commit the robbery, and Connors told Daniels of the plan to rob the stash house during several meetings. The government also produced evidence showing that Daniels voluntarily participated in planning the robbery. Connors testified that Daniels actively participated in the meetings in preparation of the robbery, even though he did not speak during most of the meetings. He also testified, and the audiotapes

11

revealed, that Lynch introduced Daniels as a member of the "crew" that would rob the stash house. Finally, Daniels was present at the final meeting and asked questions pertaining to the logistics of the robbery. He also admitted after his arrest that the plan was for "everybody" to enter the stash house during the robbery. Accordingly, we affirm Daniels' Hobbs Act conspiracy conviction.

B.    *21 U.S.C. § 846: Count 2, and 21 U.S.C. § 846, 18 U.S.C. § 2: Count 3*

Section 846 provides that:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 846. To sustain Daniels's conviction under 21 U.S.C. § 846, the government must have offered sufficient evidence to prove beyond a reasonable doubt that: (1) an illegal agreement existed to possess with intent to distribute a controlled substance; (2) Daniels knew of the agreement; and (3) Daniels knowingly and voluntarily joined the agreement. See United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002). Although the government was not required to prove that Daniels knew every detail or participated in every stage of the conspiracy, it must have established that he "knew the essential nature of the conspiracy." Id. "[M]ere presence is inadequate to establish guilt, . . . [but] it is

12

material, highly probative, and not to be discounted." United States v. Gamboa, 166 F.3d 1327, 1332 (11th Cir. 1999) (internal quotations omitted). The government is not required to prove an overt act in furtherance of a 21 U.S.C. § 846 conspiracy. United States v. Baker, 432 F.3d 1189, 1200 n.3 (11th Cir. 2005).

"The legal elements of attempt to possess with intent to distribute drugs are: (1) acting with the kind of culpability otherwise required for the commission of the crime and (2) engaging in conduct which constitutes a substantial step toward the commission of the crime." United States v. Ohayon, 483 F.3d 1281, 1292 (11th Cir. 2007) (internal quotations omitted). A substantial step "must be more than remote preparation, and must be strongly corroborative of the firmness of the defendant's criminal intent." United States v. Ballinger, 395 F.3d 1218, 1238 n.8 (11th Cir. 2005) (internal quotations omitted).

With respect to Daniels's conspiracy conviction, the government proved the existence of an agreement to possess with intent to distribute a controlled substance. Multiple conversations between Connors, Lynch, Baines, and Daniels revealed that the men had agreed to steal cocaine from the stash house, which necessarily implies intent to possess. Lynch told Connors that Lynch was going to sell the cocaine in Philadelphia, and Daniels told Connors that he assumed the men

13

were going to sell the cocaine, although he did not know the exact specifics of where or how. Moreover, the fact that the men expected to take over 15 kilograms of cocaine from the stash house indicates that their intent was to distribute the cocaine. United States v. Carrascal-Olivera, 755 F.2d 1446, 1451 (11th Cir. 1985) (concluding that eight kilograms of cocaine was sufficient to support an inference of an intent to distribute).

The government also proved that Daniels knew of the agreement to rob the stash house. Daniels was present at multiple meetings at which the robbery was discussed, and Connors testified that Daniels stood next to him and participated in several of these meetings. Finally, the government produced sufficient evidence showing that Daniels knowingly and voluntarily joined the agreement. Although Daniels argues that his mere presence at the meetings was insufficient to show that he joined the agreement, the government's evidence established more than mere presence. In addition to Connors's testimony regarding Daniels's participation in the meeting that was arranged specifically to discuss the robbery, video of the January 16th meeting shows that Daniels asked questions concerning how many rooms with closed doors Connors had seen inside the stash house. Daniels's concern regarding the logistics of the robbery indicated that he intended to participate. Finally, Daniels admitted in his post-arrest statement that "everybody"

was going to enter the stash house during the robbery. Thus, the evidence produced at trial was sufficient to sustain Daniels's conspiracy conviction.

Similarly, the evidence produced at trial was sufficient to sustain Daniels's attempt conviction. The government established that Daniels intended to commit the robbery by showing that Daniels (1) was present at the January 16th meeting, (2) asked two questions regarding the logistics of the robbery, and (3) in his post-arrest statement, admitted that "everybody" was going to enter the stash house to steal the cocaine. The government also met its burden of proving that Daniels took a "substantial step" toward the commission of the robbery. See Ohayon, 483 F.3d at 1292. Daniels's presence at the January 16th meeting was more than "remote preparation," as the meeting occurred only hours before the robbery was set to take place, final preparations for the robbery were discussed, and Baines had in his possession three firearms that were to be used during the commission of the crime. The questions Daniels asked at the final meeting, regarding the lay out of the inside of the stash house, "strongly corroborat[ed] . . . the firmness of [his] criminal intent," because they showed that Daniels wanted to be prepared when he entered the stash house. See Ballinger, 395 F.3d at 1238 n.8. Accordingly, we affirm Daniels's conspiracy and attempt convictions.

C.     *18 U.S.C. § 924(o): Count 4, and 18 U.S.C. § 924(c)(1)(A): Count 5*

15

To support a conviction for possession of a firearm in furtherance of a drug trafficking offense, under 18 U.S.C. § 924(c)(1)(A), "the Government ha[s] to establish that [the defendant] (1) knowingly (2) possessed a firearm (3) in furtherance of any drug trafficking crime for which he could be prosecuted in a court of the United States." United States v. Woodard, 531 F.3d 1352, 1362 (11th Cir. 2008). "The government must also establish some nexus between the firearm and the drug trafficking offense to show possession was in furtherance of the crime." United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004). "[U]nder § 924(c), a defendant may be liable for a co-conspirator's possession if possession was reasonable foreseeable." Id.

18 U.S.C. § 924(o) provides that "[a] person who conspires to commit an offense under subsection (c) is violated by "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A).

Daniels argues that his post-arrest statement does not specify whether he was aware of Baines's firearms prior to Baines's arrest, or whether he became aware of the firearms only after the arrest. This distinction is immaterial, however, because actual knowledge that a co-conspirator possessed a firearm is not required; instead,

16

the government must only prove that it was reasonably foreseeable that one of Daniels's co-conspirators would possess a firearm during the commission of the robbery. See Gunn, 369 F.3d at 1234. The evidence presented at trial established that Connors told the defendants that the cocaine was guarded by two armed men. In fact, Daniels was present at the December 19th meeting when Lynch told Connors that "they were going to put a bullet in [the two men guarding the stash house]." Daniels acknowledged this statement by nodding his head. Furthermore, the mere fact that the defendants were attempting to steal and transport over 15 kilograms of cocaine would make it reasonably foreseeable that firearms would be used in the commission of the offense. See id.

With respect to 18 U.S.C. § 924(o), the government was required to prove not only that it was reasonably foreseeable that Baines would knowingly possess a firearm in furtherance of the robbery, but also that Daniels entered into an agreement that he or one of his co-conspirators would possess a firearm in furtherance of the robbery. See 18 U.S.C. § 924(o). At trial, the government submitted evidence showing that: (1) Baines had three firearms on his person when he was arrested on January 16th, (2) Daniels admitted that he knew that Baines was in possession of these firearms, (3) the defendants were aware that the two men guarding the stash house were armed, (4) Lynch told Connors, in Daniels's

17

presence, that "they were going to put a bullet in [the two stash house guards]," and Daniels acknowledged this statement, and (5) Connors testified that "it was clear from the beginning from Lynch's plans that they were going to shoot and kill whoever was in the stash house." This evidence, viewed in the light most favorable to the government, proves the existence of an agreement to possess firearms in furtherance of the stash house robbery. The fact that Daniels agreed to rob the stash house, knowing that it contained over 15 kilograms of cocaine and knowing that it would be guarded by two armed guards, leads to the conclusion that Daniels and his co-conspirators agreed to possess firearms in order to commit the offense. Daniels's statement that the firearms would be given to "whoever [Baines] picked" implies that the defendants had agreed to use the firearms to effectuate the robbery.

Daniels also argues that a conviction under 18 U.S.C. § 924(o) requires proof of an overt act. However, even if 18 U.S.C. § 924(o) does require proof of an overt act, this requirement was met when Baines arrived at the January 16th meeting carrying the weapons that the men had agreed to use during the robbery that was to take place that night. See United States v. Hersh, 297 F.3d 1233, 1245 (11th Cir. 2002) (noting that "an overt act is something more . . . than evidence of a conspiracy[;] [i]t constitutes the execution or part execution of the conspiracy")

18

(internal quotations omitted). This overt act is attributable to Daniels, because "[c]o-conspirators are liable for the reasonably foreseeable acts of another co-conspirator taken in the course of and in furtherance of the unlawful agreement, regardless of whether they had actual knowledge of those acts. . . ." Baker, 432 F.3d at 1235. Accordingly, we affirm Daniels's 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 924(o) convictions.

*Sentencing Factor Manipulation*

"Where a defendant raises a sentencing argument for the first time on appeal, we review for plain error." United States v. Aguillard, 217 F.3d 1319, 1320 (11th Cir. 2000). To prevail under a plain-error standard, the appellant must establish that (1) an error occurred, (2) the error is plain, and (3) the error affected substantial rights. United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993). Once these elements are established, we may correct the error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id.

"[S]entencing factor manipulation occurs when the government's manipulation of a sting operation, even if insufficient to support a due process claim, requires that the manipulation be filtered out of the sentencing calculus." United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007). A sentencing

19

factor manipulation adjustment does not constitute a departure, because "[w]hen a court filters the manipulation out of the sentencing calculus before applying a sentencing provision, no mandatory minimum would arise in the first place." Id. Sentencing factor manipulation focuses on government conduct and requires courts to consider "whether the manipulation inherent in a sting operation, even if insufficiently oppressive to support an entrapment defense, or due process claim, must sometimes be filtered out of the sentencing calculus." United States v. Sanchez, 138 F.3d 1410, 1414 (11th Cir. 1998) (internal quotations omitted). The defendant must show "that the government's conduct is sufficiently reprehensible" by establishing that the government engaged in "extraordinary misconduct." Ciszkowski, 492 F.3d at 1271.

Daniels has failed to show that the ATF agents involved in the sting operation engaged in "extraordinary misconduct." See id. We have previously failed to find sentencing factor manipulation where the government (1) selected the age of a "minor" victim for a sting operation, even though the selected age resulted in a guideline enhancement, see United States v. Bohannon, 476 F.3d 1246, 1252 (11th Cir. 2007); (2) selected a fictitious amount of drugs to be stolen by the defendants, see Sanchez, 138 F.3d at 1412-13; and (3) provided the defendant with a firearm with a silencer to use in the commission of an offense, see Ciszkowski,

20

492 F.3d at 1271. In light of these prior cases, Daniels has failed to show that ATF agents engaged in sentencing factor manipulation simply by stating that the two men guarding the stash house would be armed or informing the defendants that the stash house contained at least 15 kilograms of cocaine.

Daniels' argument that his age rendered him particularly susceptible to the sting operation is also unavailing, because sentencing factor manipulation focuses on the government's conduct rather than the defendant's characteristics. See Sanchez, 138 F.3d at 1414. Moreover, the fact "[t]hat the sting operation involved a young adult who was not the original target does not amount to extraordinary misconduct by the government." United States v. Docampo, No. 08-10698, manuscript op. at 5 (11th Cir. Jun. 15, 2009). Accordingly, Daniels has failed to show that the district court plainly erred in not subjecting him to a statutory mandatory minimum based on sentencing factor manipulation.

*Sentencing Disparity*

Because Daniels failed to raise this issue before the district court, plain error review applies. See Aguillard, 217 F.3d at 1320. Thus, Daniels must establish that (1) an error occurred, (2) the error is plain, and (3) the error affected substantial rights. Olano, 507 U.S. at 732, 113 S.Ct. at 1776. If these elements are established, we may correct the error only if it "seriously affect[s] the fairness,

21

integrity or public reputation of judicial proceedings.  Id.

When imposing a sentence, the district court "shall consider" several factors, including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Even if 18 U.S.C. § 3553(a)(6) was interpreted to apply to disparities between codefendants' sentences, it would not apply in the present case, because Daniels was convicted of all five counts, whereas Baines and Lynch pled guilty, pursuant to written plea agreements, to only two counts each.  The plain language of § 3553(a) states that courts must consider "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6) (emphasis added).  Accordingly, the district court did not err, let alone plainly err, in failing to reduce Daniels's sentence based on disparities between his sentence and the sentences of his codefendants, and we affirm Daniels's sentences.

**AFFIRMED.**